**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION**

| | |
|---|---|
| MICHELLE STOVERN, as personal representative of the estate of Ashton Clark Gillming Stovern, | **CV-23-29-GF-BMM** |
| Plaintiff, | |
| v. | **ORDER ON PARTIAL** |
| | **SUMMARY JUDGMENT** |
| BURLINGTON NORTHERN SANTA FE RAILWAY COMPANY, and JOHN DOES 1-5, | |
| Defendant. | |

Plaintiff, Michelle Stovern ("Stovern"), as personal representative of the Estate of Ashton Clark Gillming Stovern, filed a complaint against Defendant Burlington Northern Santa Fe Railway Company ("BNSF") alleging claims of

1

negligence, negligence per se, and punitive damages on June 6, 2023. (Doc. 1.) Stovern sought to receive the benefit of a wrongful death action and survival action for the injury and subsequent death of her son, Ashton Clark Gillming Stovern ("Decedent"). (Doc. 1 ¶ 2.) BNSF moves for partial summary judgment against Stovern on her survival claim, negligence per se claim, and punitive damages claim. (Doc. 39.) Stovern opposes the motion. (Doc. 82.) The Court held a hearing on November 13, 2025. (Doc. 101). The Court grants, in part, and denies, in part, BNSF's motions for partial summary judgment.

## BACKGROUND

A BNSF train tragically struck Decedent at a railroad crossing near Brockton, Montana ("Crossing") on July 28, 2020. (Doc. 1.) Decedent was driving north along the Bureau of Indian Affairs Route 1 ("BIA Route"), when he reached the Crossing. (Doc. 1 ¶¶ 13.) The BNSF railcar struck Decedent traveling east at 57 miles per hour. (Doc. 83 ¶ 2., Doc. 41 ¶ 16.) Decedent was operating a seventy-five foot-long semitruck and trailer, while transporting gravel for his employer, Norby's Trucking ("Norby's"). (Doc. 41 ¶ 6-7, Doc. 83 ¶ 4.) Stop signs marked the Crossing for traffic traveling north and south along the BIA Route. (Doc. 41 ¶ 11.) BNSF posted no other signage at the Crossing. Decedent died at twenty-four years old from the injuries sustained in the accident. (Doc. 83 ¶ 4.)

The status of the Crossing remains in dispute. The Crossing intersects the Bender family property. (Doc. 41 ¶ 2.) BNSF contends that Brad Bender ("Bender") gave Norby's permission to access his property for farming-related purposes. (*Id*. ¶ 5.) Stovern argues that Bender has explained he has no control over the Crossing or who can use it. (Doc. 83 ¶ 14.) Bender testified that he put up a "Private Drive" sign over the Crossing to slow traffic. (*Id*. ¶ 16.) BNSF and Bender have not executed a private crossing agreement. (*Id*. ¶ 17.)

BNSF argues that the Crossing belongs to the Bender family, as a private crossing to access his property. (Doc. 41 ¶ 2.) Stovern alleges that the public has access to the Crossing. (Doc. 83 ¶ 15.) Stovern argues that residents, farmers, hunters, and fishers, routinely use or access the Crossing without permission from Bender. (*Id*.) Stovern alleges that BNSF continues to inspect, monitor, and maintain the Crossing. (Doc. 83 ¶ 22.) BNSF has placed a tag on the sign at the Crossing that informs users to call BNSF if an issue occurs. (*Id*. ¶ 24.)

Bender went to the Crossing after the accident occurred. (Doc. 41 ¶ 18.) Bender did not believe that Decedent showed signs of life. (*Id*.) Roosevelt County Sheriff Jason Fredrick sought an autopsy of Decedent following the accident. (*Id*. ¶ 19, Exhibit C.) Stovern informed Sheriff Frederick that she did not want an autopsy performed on Decedent. (*Id*.) BNSF alleges that Sheriff Frederick indicated to Stovern that performing an autopsy would be beneficial if Stovern

later would file a lawsuit against BNSF. (*Id*. ¶ 20.) Stovern requested that Decedent's body be sent to the Sidney Funeral Home as soon as possible without an autopsy being performed. (Doc. 83 ¶ 7.)

The Richland County Coroner ("Coroner") determined that Decedent died of blunt force trauma to head and chest. (Doc. 83 ¶ 9.) The Coroner further found that Decedent had survived "second/minutes" after impact with the BNSF railcar. (*Id*.) Stovern retained two experts, Dr. Ziejewski and Dr. Rayes, on the issue of Decedent's survival time. (Doc. 41 ¶ 22.) Both Dr. Ziejewski and Dr. Rayes testified "consistent with Decedent's Death Certificate that he survived 'seconds/minutes' after impact." (Doc. 83 at 24.) Dr. Ziejewski and Dr. Reyes also testified that Decedent could have suffered multiple fatal injuries from impact. (Doc. 41 ¶ 23.)

BNSF argues that the determination of whether Decedent survived the accident for an "appreciable amount of time" remains unknown without an autopsy. (Doc. 40.) BNSF argues that the force of the collision between Decedent and the BNSF railway far exceeded the force that would have been required to cause instantaneous fatal impact. (*Id*. ¶ 25-28.) BNSF contends that Stovern lacks sufficient evidence to maintain a survival action.

**LEGAL STANDARD**

4

Summary judgment proves appropriate when the movant demonstrates "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those facts that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute of material fact requires sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id*. at 248.

## DISCUSSION

BNSF seeks partial summary judgment on Stovern's claims of survivorship, negligence per se, and punitive damages. (Doc. 40 at 14, 23, 27.) BNSF also seeks summary judgment on Stovern's general negligence allegations. (Doc. 40 at 33.) Stovern opposes summary judgment. (Doc. 82.)

## I.    Stovern's Survival Claim

BNSF argues that Stovern has failed to present sufficient evidence to create a dispute of material fact that Decedent survived the accident for an appreciable amount of time. (Doc. 40 at 14.) BNSF contends that summary judgment proves appropriate on Stovern's survival claims. The Court disagrees.

"The personal representative of the decedent's estate may pursue a survival action on behalf of the decedent's estate and 'all damages recoverable in such an action are personal to the decedent.'" *Starkenburg v. State*, 934 P.2d 1018 (Mont. 1997); Mont. Code Ann. § 27-1-501. "As a corollary, the decedent's cause of

action, commonly called a survival action, cannot be pursued if the decedent's death was instantaneous." *Id.* A plaintiff seeking to recover under a survival claim must prove that the decedent survived for an appreciable amount of time. *McCormick v. W. Mont. Mental Health Ctr.*, 2003 Mont. Dist. LEXIS 2126, at *4 (Mont. Dist. Ct. 2003). The court in *McCormick* held that "[i]n the absence of [] proof [that a decedent survived his injuries for 'an appreciable length of time'] or where the evidence establishes that death was 'instantaneous,' the survivorship action fails as a matter of law." 2003 Mont. Dist. LEXIS 2126, at *4. The Montana Supreme Court in *Stevens v. Brown* concluded that testimony by a pathologist that the decedent could have survived for as short as a few seconds to a couple of minutes proved sufficient to show survival for an appreciable length of time. 503 P.2d 667, 670 (Mont. 1972).

Courts have granted summary judgment in survival actions "if the evidence equally supports theories of instantaneous death, and pre-death pain and suffering." *F/V Carolyn Jeans, Inc. v. Schmitt*, 73 F.3d 884, 885 (9th Cir. 1995). Montana's standard for determining death provides as follows: "[a]n individual who has sustained either irreversible cessation of circulatory and respiratory functions or irreversible cessation of all functions of the entire brain, including the brain stem, is dead. A determination of death must be made in accordance with accepted medical standards." Mont. Code Ann. § 50-22-101.

BNSF relies primarily on *Reich v. Iron Supply Corp.*, 1995 Mont. Dist. LEXIS 353 (Mont. Dist. Ct. 1995), to support its argument that Stovern's survival claim fails as a matter of law. The decedent in *Reich* died in an accident when he was struck by a plastic sewer pipe that had fallen from a semi-trailer. *Id*. at *1. The decedent's wife filed a wrongful death and survival action. *Id*. The defendant argued that the decedent had died instantaneously thereby warranting summary judgment in its favor on the survival action. *Id*.

The decedent's death certificate completed by the coroner listed the decedent's cause of death as cardiopulmonary arrest, occurring approximately 40 minutes after the accident. *Id*. at *4. The death certificate listed the decedent's second cause of death as "traumatic brain injury including brain stem." *Id*. The autopsy report showed that a complete transection of the brain stem had occurred, which would result in instantaneous unconsciousness. *Id*. at *4-5. The defendant's pathologist similarly concluded that Reich had sustained "irreversible cessation of all functions of the entire brain . . . at the instant he was struck by a bundle of pipe." *Id*. at 5. The plaintiff's evidence of survival consisted entirely of the deposition testimony of witnesses who had observed the decedent make movements and sounds following the accident. *Id*. The plaintiff submitted no medical testimony relating to when the decedent had died. *Id*.

7

The court determined that the evidence presented by both parties indicated that no disputed issue of material fact existed that the decedent had died instantaneously. *Id*. at 6. The court reasoned that the decedent had died instantaneously at the time of the accident when he suffered "irreversible cessation of all functions of the entire brain, including the brainstem." *Id*. at 5-6. The court further explained that the coroner's determination of the decedent's time of death, occurring approximately 40 minutes after the accident, was "not based on the [Montana] statutory definition, but rather on traditional indications of death." *Id*. (citing Commissioner's Comment to Mont. Code Ann. § 50-22-101). The court granted partial summary judgment in favor of the defendants. *Reich*, 1995 Mont. Dist. LEXIS 353, at *6.

The facts differ here. Unlike the plaintiff in *Reich*, Stovern has provided medical testimony to support the survival claim. Stovern's expert pathologist, Dr. Rayes, and Stovern's expert biomechanical engineer, Dr. Ziejewski, both provided opinions that "it is likely that the [D]ecedent survived for a few seconds after ejection." (Doc. 41 ¶ 46, Exhibit I (Rayes Report, at 2) and H (Ziejewski Report, at 11).) Dr. Rayes bases this opinion on the evidence of how far the Decedent's body traveled and the presence of intraoral and intranasal hemorrhage. (*Id*. ¶ 47.) Dr. Rayes concludes that the Decedent died due to the internal hemorrhage and secondary to intrathoracic organ and vessel lacerations. (*Id*.) Dr. Ziejewski

similarly concludes that the Decedent's injuries were inconsistent with instantaneous death, such as brain or skull injury. (Doc. 82 at 26-27.)

BNSF's criticism of the conclusions and credibility of Dr. Rayes and Dr. Ziejewski properly can be addressed during cross-examination at trial, rather than at the summary judgment stage. Both of Stovern's experts did not rule out that the Decedent could have suffered a fatal head or neck injury from the collision impact. The possibility of such a result does not defeat Stovern's survival claim. Stovern has created a genuine issue of material fact to defeat summary judgment by introducing medical testimony that the Decedent did not die instantaneously.

BNSF has not provided conclusive evidence that the Decedent died instantaneously. BNSF instead offers a competing expert opinion of the Decedent's time and cause of death. (*See* Doc. 53.) BNSF contends that the impact of the collision likely proved sufficient to cause "brainstem transection, laceration, or other instantly fatal upper cervical spinal cord or craniocerebral injury." (Doc. 41 ¶ 28.) A reasonable jury could find that the Decedent survived for an appreciable based on the competing evidence submitted by the parties.

The facts here further differ from *Reich*, considering the differences in the coroner findings. The coroner in *Reich* reported that the decedent had survived the accident for approximately forty minutes before succumbing to a cardiopulmonary arrest. The court reasoned that this finding proved insufficient to show survival

where the coroner relied on standard indications of death that contradicted Montana's definition of death. The same is not true here.

The Coroner concluded that the Decedent died of blunt force trauma to the head and chest but had survived "seconds/minutes" after impact. (Doc. 83 ¶ 9; Doc. 86, Exhibit 7.) The Coroner's report does not conflict with Montana's statutory determination of death, Mont. Code. Ann. § 50-22-101, or with "traditional indications of death." *See Reich,* 1995 Mont. Dist. LEXIS 353, at *6. The Coroner concluded that Decedent may have survived for "second/minutes" given the factual circumstances and the Coroner's investigation into Decedent's death. The Coroner's conclusion comports with other reports provided by Stovern that the Decedent did not die on impact and was not considered "dead" as outlined in Mont. Code. Ann. § 50-22-101.

Stovern provided sufficient evidence of Decedent's survival, even if for a short amount time, by presenting the Coroner's report and expert witness testimony supporting Decedent's time of death. Evidence that a decedent survived for seconds to a couple of minutes after impact could support a survival claim. *Stevens*, 503 P.2d at 670. Questions of fact remain for the jury, such as whether Decedent survived for "an appreciable amount of time." Stovern has provided sufficient evidence to maintain the survival action and defeat a partial summary judgment motion, even absent an autopsy report.

10

## II.    Stovern's Negligence Per Se Claim

BNSF first contends that Stovern failed to allege liability under Mont. Code Ann. § 69-14-602 in the complaint and subsequent discovery responses. (Doc. 89 at 3.) Montana law requires railroad companies to "construct and maintain in proper condition a good and safe crossing" on public road crossings. Mont. Code Ann. § 60-14-602 (2023) (cleaned up). Stovern alleges a claim for negligence per se. (Doc. 1, ¶ 25.)  Stovern specifically alleges that BNSF "violated rules, statutes, regulations designed to protect the motoring public." (*Id*.) Stovern further alleges that BNSF failed to inspect and repair unsafe crossing conditions. (*Id.* ¶¶ 46–54.) This allegation reflects the language of § 69-14-602 that railroads owe a duty to maintain public road crossings in "good and safe" conditions. The allegations in total sufficiently put BNSF on notice that Stovern could argue that BNSF owed a duty of care under § 69-14-602.

BNSF next contends that Stovern failed to allege sufficient evidence that BNSF violated § 69-14-602 as the Bender family maintained a private driveway. (Doc. 89 at 4.) A public road means one that is (1) publicly "built and maintained with appropriated funds of the United States;" (2) "dedicated to public use;" (3) "acquired by eminent domain," or (4) "acquired by adverse use by the public, with jurisdiction having been assumed by the state or any political subdivision of the state." Mont. Code Ann. § 60-1-103(23) (2023). No facts exist to suggest that the

11

state of Montana, or another subdivision of the state of Montana, assumed jurisdiction of the road for public adverse use. *Id*. Stovern nowhere alleges any facts that the public had acquired the driveway by eminent domain. *Id*. The driveway's potential status as a public road in this case turns on whether it had been publicly "built and maintained" or "dedicated to public use." *Id*.

Stovern points to *Descheemaeker v. Anderson*, 310 P.2d 587 (Mont. 1957), as support that Bender had dedicated the road intersecting the Crossing to public use. (Doc. 82 at 33.) *Descheemaeker* involved an action for quiet title of a road that extended onto the plaintiff's property. *Id*. at 587–88. The defendant argued that the original landowner had dedicated the roadway to the public and that dedication bound the successors of interest in the property. *Id*. No public record existed to show that the original landowner had dedicated the roadway to public use. *Id*. at 590. The defendant presented evidence that the public used the road, the county funded repairs to the road and built a fence along the road, and the original landowner told a county surveyor that the road had been dedicated to public use. *Id*.

The court first concluded that the original landowner had the capacity to make a public grant of use. *Id*. at 590. The original landowner owned the property as "an unlimited estate or an estate in fee simple." *Id*. at 591. The court next determined that the evidence failed to "establish a common law dedication." *Id*.

12

The defendant failed to present "clear, satisfactory, and unequivocal proof" that the landowner had dedicated his roadway to public use. *Id*.

The facts present a mixed result as to whether Bender had the "capacity to make a public grant of use" of the driveway. *Id*. at 590. The parties indicated at the hearing that Bender believed he had to allow the public to use the driveway and crossing as he owned some of his allotment in trust on the Fort Peck Reservation. The parties failed to explain how a potential trust allotment could affect Bender's ability to grant a public use. Stovern presented some evidence to suggest that the driveway formally had been dedicated to public use. *Id*. at 591. Fort Peck tribal members and other residents of the area use the driveway for access to hunt, fish, and visit neighboring properties. (Doc. 82 at 14.) Like the court in *Descheemaeker* that rejected the limited evidence of the public's use of a road, the facts here fail to provide "clear, satisfactory, and unequivocal" proof that the driveway had been publicly dedicated. 310 P.2d at 591. Stovern fails to establish a common law dedication of the Crossing. *Id*.

A genuine dispute of material fact remains as to whether the Crossing intersected with a publicly built and maintained road. BNSF agreed at the hearing that the Fort Peck Tribe maintained parts of the road intersecting with the Crossing. BNSF specifically stated that the "Tribal trust" maintained some of the road. The Court construes the "Tribal trust" to mean the tribal government. BNSF

13

also agreed that Bender's property may be on allotted tribal trust land. Bender

indicated that Fort Peck tribal members accessed the Crossing to travel across the

Fort Peck Reservation. (Casey Dec. Ex. 9, Dep. Bender at 14:2–14; Doc. 44-1,

BNSF Ex. B, Dep. Bender at 8, 22:5–16.)

  The Crossing appears to be connected to the BIA route. (Doc. 82 at 12–13.)

The BIA route may have been built through appropriated funds by the federal

government as the name of the route reflects the name of the federal entity. A

dispute remains as to whether the crossing constituted a public crossing. BNSF

fails to establish entitlement to summary judgment on these grounds.

  Stovern concedes that she pursues no negligence per se claims regarding

various federal regulations, including 49 C.F.R. § 229.129, 49 C.F.R. § 229.125,

23 C.F.R. § 646.214(b)(3)(i), 49 C.F.R. § 217.11 or 49 C.F.R. § 218.11. (Doc. 82

at 34.) The Court grants partial summary judgment to BNSF on Stovern's

negligence per se claims involving these federal regulations except to the extent

that Stovern presents evidence regarding the decedent's ability to hear and

appreciate BNSF's horn under a general theory of negligence. Stovern also may

continue to present evidence that BNSF failed to follow its operating rules under a

general theory of negligence.

### III. Stovern's Punitive Damages Claim

BNSF argues that Stovern has failed to produce sufficient evidence to support her punitive damages claim. (Doc. 40 at 27.) BNSF contends that no other accidents have been reported at the Crossing. (*Id*. at 29.) BNSF asserts that Stovern has failed to show allegations that BNSF had actual knowledge or intentionally disregarded the conditions of the Crossing to cause a high probability of harm to another. (*Id*.)

Montana requires a showing of actual malice or actual fraud for an award of punitive damages. Mont. Code Ann. § 27-1-221. Stovern has advanced only claims of actual malice in support of her punitive damages claim. (Doc. 40 at 27.) The standard of "actual malice" requires a plaintiff to present evidence that a defendant had "knowledge of facts or intentionally disregard[ed] facts that create[d] a high probability of injury to the plaintiff" and either acted "in conscious or intentional disregard of the high probability of injury to the plaintiff" or acted "with indifference to the high probability of injury to the plaintiff." Mont. Code Ann. § 27-1-221(2). A plaintiff must demonstrate the defendant had actual knowledge of the facts to support a finding of malice. *Plouffe v. Mont. Dep't of Pub. Health & Human Servs.*, 45 P.3d 10, 17 (Mont. 2002).

A plaintiff must demonstrate actual malice by clear and convincing evidence. *McColl v. Lang*, 381 P.3d 574 (citing Mont. Code Ann. § 27-1-221). "Where the … 'clear and convincing' evidence requirement applies, the trial

15

judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant." *Anderson*, 477 U.S. at 255. Allegations of mere negligence cannot form the basis of an award of punitive damages. *Guinnane v. Dobbins*, 2019 WL 3208068, at *3 (D. Mont. July 16, 2019) (citing Mont. Code. Ann. § 27-1-221; *Campbell v. AC and S, Inc.*, 704 F. Supp. 1020, 1021 (D. Mont. 1989)).

Stovern relies on *Runkle v. Burlington Northern*, 613 P.2d 982, 306–07 (Mont. 1980), to argue that repeated notice of danger and failure to implement adequate warnings at a railroad crossing can support a claim for punitive damages. *Runkle* concluded that the inactions of a railroad, with a duty to ameliorate potentially dangerous conditions, could rise to the level of malice. *Id*. A jury could award punitive damages if it was shown that the railroad (1) had a duty to ameliorate the danger, (2) took actions on its own to avoid fixing the danger, and (3) had knowledge of the danger. *Id*. at 307.

Stovern alleges that BNSF inspected the Crossing at least twice a week. (Doc. 82 at 40.) Stovern has presented evidence that BNSF trained its inspectors to identify safety risks, including sight distance and signage warnings inadequacies. (*Id*. at 40-41.) Stovern asserts that, even with these safety considerations, BNSF

16

intentionally disregarded the safety hazards of the Crossing to create a high probability of injury.

These allegations sufficiently demonstrate that BNSF had actual knowledge of potential the alleged safety hazards and dangers at the Crossing. BNSF failed to take steps to fix the alleged safety hazards at the Crossing after repeated inspections. The Court determines that these allegations by Stovern create a genuine issue of material fact to defeat summary judgment on the punitive damages claim. A reasonable jury could conclude that BNSF's conduct rises to the level of actual malice.

## IV.  Stovern's Local Safety Hazard Claims

BNSF seeks summary judgment on Stovern's claims that an essentially local safety hazard existed at the crossing. (Doc. 40 at 33.) The question of whether an exception for "an essentially local safety hazard" applies requires a court to make two determinations: 1) whether a federal regulation "covers the subject matter" of the claims; and 2) that a state has "adopted or continue[d] [to enforce] an additional or more stringent law, regulation, or order related to railroad safety or security." *Union Pac. R.R. Co. v. Cal. Pub. Util. Comm'n*, 346 F.3d 851, 858 (9th Cir. 2003) (quoting 49 U.S.C. § 20106). An "essentially local safety hazard" may fail to be "adequately encompassed within national uniform standards." *Id*. at 860.

A court should consider "the nature of the hazard . . . to determine whether it [was] the type of hazard that is properly dealt with on a local level." *Id*. at 860.

The Court notes that 49 C.F.R § 646.214(b)(3) requires "adequate warning devices," including "automatic gates with flashing light signals," where "high speed train operation combined with limited sight distance" exists. The regulation only covers crossings involving "a federal-aid highway project for construction of a new highway or improvement of the existing roadway." 49 C.F.R § 646.214(b)(2). Federal regulation § 646.214(b)(3) would not "cover the subject matter" of Stovern's claims if the jury determines that the Crossing failed to constitute a public crossing. *Union Pacific*, 346 F.3d at 858. Stovern's claims would fail to be "adequately encompassed within national uniform standards" under those circumstances. *Id*. at 860.

The question of whether the Crossing's conditions constitute "unique, site-specific hazards" remains a factual determination more appropriate for the jury's determination. *Easterwood v. CSX Transp. Inc.*, 507 U.S. 658, 675 n.15 (1993). Stovern alleges that overgrown vegetation around the Crossing obstructed drivers' potential sightline of incoming trains. (Doc. 82 at 36). Stovern adds that the Crossing had no active warning devices. (*Id*.) Stovern also alleges that a humped vertical approach caused extended truck clearance times. (*Id*). Stovern supports this allegation with testimony from Bender and others explaining how the

18

conditions at the Crossing forced drivers to "roll through the stop sign" and "accelerate early" or face being caught on the tracks. (*Id.*) A reasonable jury still could find that the nature of the alleged hazards involves "the type [] [more] properly dealt with on a local level." *Union Pacific*, 346 F.3d at 860. The Court denies BNSF's motion for summary judgment.

BNSF further seeks summary judgment on Stovern's general allegations that BNSF failed to provide proper audible warnings, that BNSF failed to report unsafe conditions internally, and BNSF failed to train, instruct and manage its employees. (Doc. 40 at 34–35.) The Court denies summary judgment because Stovern may allege specific claims that support her overall claim of negligence.

## ORDER

Accordingly, **IT IS HEREBY ORDERED** BNSF's Motion for Partial Summary Judgment (Doc. 39) is **GRANTED**, in part, and **DENIED**, in part:

- BNSF is not entitled to summary judgment on the survival claims.

- BNSF is entitled to summary judgment on the negligence per se claims regarding the Code of Federal Regulations.

- BNSF is not entitled to summary judgment on the negligence per se claims involving Mont. Code Ann. § 69-14-602.

- BNSF is not entitled to summary judgment on the punitive damages claims.

- BNSF is not entitled to summary judgment on the local safety hazard claims.

- BNSF is not entitled to summary judgment on Stovern's "general allegations."

DATED this 1st day of December, 2025.

_____

Brian Morris, Chief District Judge
United States District Court